# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re Ex Parte* Application of<br><br>CFE International LLC,<br><br>     Applicant,<br><br>   v.<br><br>Denham Capital Management LP,<br><br>     Respondent. | Case No. 22-MC-91355-FDS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER PURSUANT TO 28 U.S.C. § 1782 PERMITTING CFE INTERNATIONAL LLC TO ISSUE SUBPOENAS FOR THE TAKING OF A DEPOSITION AND THE PRODUCTION OF DOCUMENTS FROM DENHAM CAPITAL MANAGEMENT LP** |

**FILED *EX PARTE* AND UNDER SEAL**

CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Applicant CFE International LLC*

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 4

I.    The Key Players ................................................................................................ 4

II.   Denham's Investment in WWM and the Subsequent Award of the Waha Connector
      Agreements and Waha Supply Agreement to WWM ........................................ 6

III.  The Mexican Criminal Proceeding ................................................................... 8

IV.   Why Discovery Is Needed ................................................................................ 11

      A.    Documents and Communications Concerning Actual or Potential CFE or
            CFEi Projects or Transactions ................................................................. 12

      B.    Denham's WWM Investment and Divestment Decisions ........................ 13

      C.    Background Information About the Business of Denham ......................... 13

SECTION 1782 ENTITLES CFEI TO TAKE DISCOVERY FROM DENHAM ....................... 13

I.    CFEi's Application Meets Section 1782's Threshold Requirements ................ 13

II.   The Discretionary Factors Courts Consider in Granting Section 1782 Applications
      Also Weigh in Favor of Granting CFEi's Application ...................................... 16

      A.    Denham Is Not a Participant in the Mexican Criminal Proceeding ......... 16

      B.    The Mexican Authorities Are Receptive to U.S. Judicial Assistance ...... 17

      C.    This Application Is a Good Faith Effort to Obtain Probative and Relevant
            Evidence for a Foreign Proceeding, and in No Way Circumvents Foreign
            Proof-Gathering Restrictions .................................................................. 18

      D.    The Discovery Sought Is Not Unduly Intrusive or Burdensome ............. 18

CONCLUSION .......................................................................................................... 19

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Application of O2CNI Co., Ltd.,*
  2013 WL 5826730 (N.D. Cal. Oct. 29, 2013)..........................................................................15

*In re Application of Qumma,*
  2005 WL 937486 (S.D.N.Y. Apr. 22, 2006)......................................................................17, 18

*In re Caceres,*
  2020 WL 2523120 (S.D. Miss. May 18, 2020) ......................................................................15

*Chevron Corp.* v. *Shefftz,*
  754 F. Supp. 2d 254 (D. Mass. 2010) ....................................................................................18

*In re Children's Inv. Fund Found. (UK),*
  363 F. Supp. 3d 361 (S.D.N.Y. 2019).....................................................................................15

*Grupo Mexico Sab De CV,*
  2014 WL 12691097 (N.D. Tex. Oct. 17, 2014) ......................................................................18

*Intel Corp.* v. *Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004).................................................................................................4, 15, 16, 17

*In re Microsoft Corp.,*
  428 F. Supp. 2d 188 (S.D.N.Y. 2006)......................................................................................18

*In re Penner,*
  2017 WL 5632658 (D. Mass. Nov. 22, 2017) .........................................................................17

*In re Schlich,*
  893 F.3d 40 (1st Cir. 2018)................................................................................................14, 16

*In re Valitus, Ltd.,*
  2020 WL 6395591 (D. Mass. Nov. 2, 2020) .............................................................14, 17, 19

**Statutes**

28 U.S.C. § 1782................................................................................................................*passim*

**INTRODUCTION**

CFE International LLC ("CFEi"), a Texas-based natural gas company and wholly owned subsidiary of the state-owned electric utility of Mexico, Comisión Federal de Electricidad ("CFE"), seeks, through this application (the "Application"), an order pursuant to 28 U.S.C. § 1782 granting CFEi discovery from Denham Capital Management LP for use in a foreign criminal proceeding.[1]   That proceeding (the "Mexican Criminal Proceeding") comprises an ongoing criminal investigation conducted by the Office of the Special Anti-Corruption Prosecutor in Mexico City, Mexico, of Guillermo Turrent Schnaas ("Turrent") and Javier Gutiérrez Becerril ("Gutiérrez"), and a criminal case underway in Mexico against Gutiérrez and another former CFE employee.

The Mexican Criminal Proceeding involves allegations that, in December 2016, Turrent, then an executive of CFE and Chief Executive Officer ("CEO") of CFEi, and Gutiérrez, then an executive of CFE and Chief Operating Officer ("COO") of CFEi, as public servants, violated the Mexican Constitution and Mexican criminal and procurement laws by improperly awarding subsidiaries of a U.S. company, WhiteWater Midstream LLC (together with its subsidiaries and affiliates, "WWM"), massive natural gas contracts to build, provide transportation capacity on, and market gas on Texas pipelines whose construction was sponsored by CFE (the "Waha Connector Agreements").  (Declaration of Fernando Aponte Martínez ("Aponte Decl.") ¶¶ 30–33.) Turrent and Gutiérrez awarded these contracts, with an estimated revenue to WWM of

---

[1]   Accompanying this application is CFEi's motion to file all papers in this matter *ex parte* and under seal until the requested subpoenas are served.  CFEi respectfully requests that the Court grant that motion for all the reasons stated therein.

hundreds of millions of dollars over the lifetime of the deals, to benefit WWM and to the detriment of Mexico and its people.[2]  (*Id.*)

WWM, the beneficiary of the improperly awarded Waha Connector Agreements at issue in the Mexican Criminal Proceeding, was formed on March 30, 2016 by Matthew Calhoun ("Calhoun"), WWM's co-founder and President of Commercial Operations, who has longstanding personal and professional relationships with Turrent and Gutiérrez.  (Declaration of Sam Anson ("Anson Decl.") ¶¶ 12, 27.)  Arlin Travis ("Travis"), WWM's Senior Vice President of Marketing since 2020 and formerly Senior Vice President of Business Development from 2017 to 2020, also has longstanding personal and professional relationships with Calhoun and Turrent, respectively. (*Id.*)

Denham Capital Management LP (together with its subsidiaries and affiliates, "Denham") was incorporated in 2006 as a Delaware corporation.  Its headquarters and principal place of business are in Boston, Massachusetts.  (Anson Decl. ¶ 16.)  Denham is a global private equity investment firm specializing in the energy sector "with more than $12 billion of invested and committed capital across multiple fund vehicles."  (*Id.*)

Denham was the first major investor in WWM during the period in which Turrent and Gutiérrez ran CFEi.  (Anson Decl. ¶ 33.)  In May 2016, less than two months after WWM was formed, Denham's co-founder and CEO, Stuart Porter, met with Turrent and representatives from WWM.  (*Id.*)  Shortly after that meeting, Turrent assured Porter in an email that he would "take care of" the "Waha stuff" for WWM.  (*Id.*)  Two days later, Turrent signed a Memorandum of Understanding ("MoU") to enter into a contract with WWM to supply enormous quantities of natural gas to CFEi, and to manage and monetize CFEi's transportation capacity on pipelines.  (*Id.*

---

[2]   These contracts were later assigned in early 2017 to CFEi.  (Aponte Decl. ¶ 30.)

¶¶ 32–33.) On or about July 1, 2016, Denham and another private equity firm made a combined $200 million investment in WWM. (*Id.* ¶ 34.) By December 2017, Denham held a 100% interest in WhiteWater Midstream Investment Holdings LLC. (*Id.* ¶ 44.) In February 2019, shortly after the departure of Turrent and Gutiérrez from CFEi, Denham sold its stake in WWM. (*Id.* ¶ 45.) During the period between Denham's initial investment in WWM in July 2016 and its exit in February 2019, Turrent and Gutiérrez awarded WWM three sets of long-term natural gas supply and pipeline contracts worth billions of dollars, including the Waha Connector Agreements that are the subject of the Mexican Criminal Proceeding.

The information CFEi seeks from Denham is limited in scope. CFEi seeks documents regarding actual or potential CFE or CFEi projects, including the Waha Connector Agreements, as well as communications concerning the relationship between Turrent, Gutiérrez, and WWM and its executives, and the circumstances under which CFEi awarded the Waha Connector and other substantial contracts to WWM. This information goes to the heart of the Mexican Criminal Proceeding. Evidence relating to Turrent's and Gutiérrez's efforts, outside the required public tender processes, to steer contracts involving billions of dollars of public funds to Calhoun, their longtime friend and partner, would aid the Mexican prosecutors in investigating and establishing, and the Mexican court in adjudicating, whether Turrent and Gutiérrez violated Mexican procurement laws in awarding the Waha Connector Agreements to WWM.

This Application meets each of Section 1782's three statutory requirements: (1) Denham "resides" or can be "found" in this District; (2) the discovery sought is "for use" in the Mexican Criminal Proceeding, which qualifies as a foreign proceeding under Section 1782; and (3) CFEi is an "interested person" in that proceeding. *See* 28 U.S.C. § 1782; *see also Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241, 256–59 (2004).

Moreover, all four discretionary factors that a court considers in determining whether to grant a Section 1782 request, *id.* at 264–65, also support granting this Application. As explained in more detail below: (a) Denham does not participate or appear in the Mexican Criminal Proceeding; (b) the Mexican courts are receptive to the assistance of U.S. federal courts; (c) CFEi's discovery requests do not attempt to circumvent foreign proof-gathering restrictions, as they are a good-faith effort to obtain probative evidence; and (d) these requests are not unduly burdensome, as they are tailored to obtain information that is of substantial importance and interest to the Mexican Criminal Proceeding and would be permitted under the Federal Rules of Civil Procedure, which govern discovery produced pursuant to Section 1782 unless this Court prescribes otherwise.[3] (*Id.*)

For these reasons, CFEi respectfully requests that the Court grant this Section 1782 Application.

## **FACTUAL BACKGROUND**

### I.     **The Key Players**

Denham is a Boston-based private equity firm specializing in energy sector investments. (Anson Decl. ¶ 16.) In mid-2016, Denham became the first financial backer of WWM's operations, before WWM had acquired any significant infrastructure or contracts. (*Id.* ¶ 33.)

---

[3]  The U.S. District Courts for the Western and Southern Districts of Texas have granted CFE's *ex parte* applications seeking related discovery from Antaeus Group LLC ("Antaeus Group"), Arbor Glen Consulting, LLC ("Arbor Glen"), and JG Energy Consulting Corporation in aid of the Mexican Criminal Proceeding. *See In re Ex Parte Application of CFE International LLC*, No. 22-mc-00365-LY-ML, Dkt. No. 20 (W.D. Tex. May 4, 2022); *In re Ex Parte Application of CFE International LLC*, No. 22-mc-00429-LY-ML, Dkt. No. 12 (W.D. Tex. May 10, 2022); *In re Ex Parte Application of CFE International LLC*, No. 22-mc-00896, Dkt. No. 23 (S.D. Tex. June 7, 2022). Antaeus Group and Arbor Glen have moved to quash the subpoenas, and CFEi has opposed their motions. The motions are currently pending.

CFEi is a U.S.-based natural gas company and wholly owned subsidiary of CFE. (Aponte Decl. ¶¶ 9–10, 20.)  CFEi was formed in 2015, with formal operations commencing in 2016. (*Id.*)  Its principal place of business and headquarters are in Houston, Texas. (*Id.* ¶ 4.)  CFEi operates as the international trading arm of CFE, procuring natural gas in the U.S. market for transport to Mexico.  (*Id.* ¶ 10.)  In 2014, the prior Mexican administration instituted a constitutional reform that privatized the energy sector, opening it up to private investment and competition for the first time in over 70 years.  (*Id.* ¶ 6.)  It was at this time that Turrent and Gutiérrez joined CFE to help it take advantage of the energy industry's expanded reliance on natural gas, including from U.S. sources, which is used to produce electricity in Mexico. (*Id.* ¶ 8.)

Gutiérrez joined CFE in April 2014, the same month that the prior Mexican president submitted the energy reform bill to Congress for approval, and he served as Subdirector of Modernization there through February 2017. (Aponte Decl. ¶¶ 8, 31.)  He also served as the COO of CFEi from June 2015 until December 2018. (*Id.* ¶ 31.)  Turrent served as Director of Modernization at CFE from January 2013 through September 2016.  He was also the CEO of CFEi from June 2015 until December 2018. (*Id.*)

WWM is a limited liability company that was incorporated in Delaware in March 2016. (Anson Decl. ¶ 15.)  Its formal operations began in June 2016. (*Id.*)  WWM is a midstream service provider that operates in the gas delivery and sale business.[4]  (*Id.*)  Its principal place of business is Austin, Texas. (*Id.*)  Calhoun formed WWM with CEO Christer Rundlof ("Rundlof"), among others. (*Id.*)

---

[4]   Midstream natural gas companies operate the pipeline facilities that process, transport, and sell gas downstream from natural gas producers to other consumers or midstream players.

II.    **Denham's Investment in WWM and the Subsequent Award of the Waha Connector Agreements and Waha Supply Agreement to WWM**

The Waha Connector Agreements provided for WWM to build the Waha Connector pipeline, transport natural gas along the pipeline, and market the pipeline's capacity. (Anson Decl. ¶ 19.)  The Waha Supply Agreement was a long-term contract that obligated WWM to supply up to one million MMBtu[5] of natural gas per day along the Waha Connector pipeline to CFEi.  (*Id.* ¶ 43.)  Turrent, Gutiérrez, and WWM conceived of the Waha Connector Agreements and Waha Supply Agreement as a package deal from the start.  (*Id.* ¶ 31.)  Before soliciting bids for the Waha Connector Agreements and Waha Supply Agreement in July and August 2016, Turrent and Gutiérrez first negotiated terms for both sets of agreements with WWM.  (*Id.* ¶¶ 32, 35–37.)  As we discuss below, the terms of those agreements are very similar in critical respects to the final contracts ultimately awarded to WWM.  (*Id.*)

In May 2016, only two months after WWM was formed, Denham's Porter met with Turrent and a group of representatives from WWM in San Diego, California, to discuss future CFEi and WWM business.  (*Id.* ¶ 33.)  At that time, CFEi had not yet launched a "bid" process for the Waha Connector Agreements or Waha Supply Agreement.  Nevertheless, following that meeting, Turrent emailed Porter on May 28, 2016, stating "[o]n the waha stuff, we will take care of it the [sic] whitewater folks." (*Id.*)  Seemingly as promised, two days later, on May 30, 2016, Turrent signed an MoU with WWM relating to what became the Waha Connector Agreements and the closely related Waha Supply Agreement.  (*Id.*)  On July 1, 2016, Denham and another private equity firm made a combined investment of $200 million in WWM.  (*Id.* ¶ 34.)

Later in July 2016, *after* Turrent signed the MoU with WWM and Denham invested

---

5    The principal unit of measurement for natural gas is a British thermal unit or "Btu." "MBtu" and "MMBtu" refer to one thousand and one million British thermal units, respectively.

in WWM, CFEi launched a public tender process for the Waha Supply Agreement by issuing the Waha Supply Request for Offers ("RFO"). (Anson Decl. ¶ 35.) WWM submitted a bid in response to the RFO. (*Id.* ¶ 38.) Even though several more established companies submitted bids offering lower prices to CFEi, Turrent and Gutiérrez awarded the lucrative Waha Supply Agreement to WWM. (*Id.* ¶ 43.)

WWM and Turrent and Gutiérrez likewise negotiated terms of the Waha Connector Agreements before CFEi solicited bids from other companies. (Anson Decl. ¶ 36.) In August 2016, CFE and WWM negotiated a Precedent Agreement for the Waha Connector Agreements, which the parties described as "pursuant to the [May 30, 2016] Memorandum of Understanding." (*Id.*)

Approximately two weeks *after* WWM sent Turrent and Gutiérrez the August 2016 Precedent Agreement, Turrent and Gutiérrez solicited bids for the Waha Connector Agreements from two other parties. (Anson Decl. ¶ 37.) There is no evidence suggesting that Turrent or Gutiérrez engaged with either of those bidders concerning the bids after they were submitted. (*Id.*) Turrent and Gutiérrez never launched a formal public tender process for the Waha Connector Agreements. (*Id.* ¶ 31.) In September 2016, Turrent and Gutiérrez finalized the essential terms of the Waha Connector Agreements with WWM, leading to a "kickoff meeting" among the principals. (*Id.* ¶ 39.) This kickoff meeting took place even before WWM submitted its formal bid for the Waha Connector Agreements. (*Id.*) Several key terms of the final Waha Connector Agreements closely mirror the Precedent Agreement with WWM. (*Id.* ¶ 36.)

Denham supported WWM's bids for both the Waha Connector Agreements and the Waha Supply Agreement. (Anson Decl. ¶ 38.) On August 19, 2016, Anthony T. Fiore, Denham's Managing Director and Associate General Counsel, issued a letter of support for WWM, which

7

WWM included in its October 11, 2016 bid in response to the Waha Supply RFO.  (*Id.*)  On December 9, 2016, Fiore sent a letter to WWM committing to fund the construction of the Waha Connector pipeline for up to $50 million.  (*Id.*)  This letter was included as an exhibit to the Waha Connector Agreements. (*Id.*)

CFEi officially awarded WWM the Waha Connector Agreements in December 2016 and the closely linked Waha Supply Agreement in March 2017.  (Anson Decl. ¶¶ 41, 43.)

Later, when CFEi's outside counsel were authoring a memorandum on the awarding of the Waha Connector Agreements to WWM, Gutiérrez represented to the outside counsel that CFEi sought a bid from WWM only after receiving purportedly unsatisfactory offers from other bidders.  (*Id.* ¶ 42.)  That assertion was false.  (*Id.*)  Turrent and Gutiérrez negotiated the MoU to give WWM the Waha Connector Agreements and the Waha Supply Agreement, and negotiated the Precedent Agreement for the Waha Connector Agreements, months before they sought bids from any other party.  Gutiérrez's false statement to CFEi's outside counsel sought to create the misleading impression that the bid process to award the Waha Connector Agreements was competitive when it was not.  (*Id.*)

Turrent departed from CFEi on December 1, 2018; Gutiérrez left CFEi on February 1, 2019.  (Anson Decl. ¶ 45.)  Soon thereafter, on February 4, 2019, Denham sold its position in WWM.  (*Id.*)  At the time of that sale, Rundlof publicly stated:  "We are grateful to have had Denham and [the other principal private equity fund investor] as trusted partners.  We appreciate their confidence in backing WhiteWater as a first-time team."  (*Id.*)

### III.    The Mexican Criminal Proceeding

In December 2018, Mexico elected a new President who appointed new leadership for CFEi.  That new leadership, through its newly appointed Chief Compliance Officer, learned in

8

December 2020 that Gutiérrez had, in February 2017, executed a formal assignment of several U.S.-based CFE contracts to CFEi without proper power of attorney and public notarization, a significant discrepancy in Mexico's formal legal system. (Aponte Decl. ¶ 30.) This discovery prompted a review of the contracts assigned, which included the Waha Connector Agreements. Through this process, CFEi learned of irregularities in how, and on what terms, the Waha Connector Agreements were awarded to WWM. (*Id.* ¶¶ 30–33.) Specifically, CFEi learned that, in December 2016, key former CFEi executives, including Turrent and Gutiérrez, on behalf of CFE, improperly awarded the Waha Connector Agreements, valued at hundreds of millions of dollars, to WWM, without complying with the strict Mexican constitutional and criminal procurement regulations that govern public contracts.[6] (*Id.*)

Prior to awarding the contracts, CFE was obligated to undergo and document a public tender process pursuant to Mexican constitutional and criminal laws. (Aponte Decl. ¶¶ 14–18.) However, in contravention of this process and Mexican criminal law, and as discussed above, CFE did not launch a formal public tender for the Waha Connector Agreements. Moreover, CFE

---

[6]   CFE and its employees are governed by constitutional, criminal, and entity-specific laws that apply to public entities and public servants. (Aponte Decl. ¶¶ 14–18.) In addition to general Mexican tender and procurement laws that establish obligations for all public sector supply and service contracts, CFE and its employees are also subject to a specific Mexican federal law, the CFE Law (2014), which mandates specific tender and procurement procedures for CFE and its affiliates. (*Id.* ¶¶ 15–16.) CFE's and CFEi's procurement procedures are further regulated by detailed, binding tender guidelines issued, and periodically updated, by CFE's Board of Directors. (*Id.* ¶ 18.)

The CFE Law also prohibits CFE from entertaining proposals from, or entering into contracts with, individuals or entities that may represent a conflict of interest, and requires that its employees at all times act with honesty and transparency in the exercise of their functions, including when entering into transactions affecting public assets. (*Id.* ¶¶ 15, 33.)

Mexico's Anticorruption Laws (in effect at the time of the Waha Connector Agreements and now) also provide for obligations that govern public servants' management of public resources, including prohibitions against conflicts of interest and transparency requirements. (*Id.* ¶ 17.)

had already negotiated a Precedent Agreement with WWM before soliciting bids from two other entities. (Anson Decl. ¶¶ 31, 36–37, 39.) WWM also lacked the requisite industry experience and credit history that would have qualified it to enter into contracts with such large natural gas volume, term length, and value. (Aponte Decl. ¶ 32). At the time the contracts were awarded to WWM, Calhoun and Rundlof had formed WWM just months earlier, in March 2016. (Aponte Decl. ¶ 32; Anson Decl. ¶ 15.) In addition, the terms of the agreements unfairly benefitted WWM to the detriment of CFE and CFEi, and at the expense of Mexican public assets and Mexican consumers. (Aponte Decl. ¶ 32; Anson Decl. ¶ 28.)

       In August 2021, in accord with its obligations under Mexican law to report likely criminal acts, and as a victim whose legally protected public assets were affected by the conduct at issue, CFEi reported suspected violations of Mexican law to the Attorney General of Mexico by filing a criminal complaint (the "Criminal Complaint"). (Aponte Decl. ¶¶ 19–20, 34.)

       In response to the Criminal Complaint, the Office of the Mexican Special Anti-Corruption Prosecutor in Mexico City opened an investigation into Turrent's and Gutiérrez's allegedly criminal abuses of power. (Aponte Decl. ¶ 35.) The investigation is ongoing. (*Id.* ¶ 39–40.) CFEi has cooperated, and intends to continue cooperating, with this investigation by providing relevant information to the prosecution in connection with the proceeding. (*Id.* ¶ 40.) Indeed, CFEi, as an "injured party" and victim complainant, has the right to present evidence in aid of the ongoing investigation and in subsequent court proceedings. (*Id.* ¶¶ 21–29, 42.)

       In February 2022, the Mexican prosecutors asked a court in Mexico to schedule a hearing to allow prosecutors to present formal charges against Gutiérrez and another former CFE employee in relation to the Criminal Complaint. (Aponte Decl. ¶ 37.) On May 23, 2022, the court in Mexico held an initial hearing to consider the Mexican prosecutors' application. The

prosecutors, the two accused defendants and their counsel, and representatives of CFEi and CFE, and their counsel, attended the hearing. (*Id.* ¶ 38.) During the hearing, counsel for the accused requested an adjournment to have additional time to review a new expert report provided by the Attorney General's Office (Fiscalía General de la República de México, or "FGR"). (*Id.* ¶ 39.) The judge adjourned the initial hearing to August 17, 2022, to allow for that review and to allow the FGR additional time to conduct its initial investigation. (*Id.*)

## IV.    Why Discovery Is Needed

The allegations underlying the Mexican Criminal Proceeding concern Gutiérrez's and Turrent's award of the Waha Connector Agreements to WWM in violation of Mexican procurement law. CFEi, through this Application, seeks discovery from Denham, the private equity firm that participated in discussions between WWM and CFEi before bids were solicited from any other entity and backed WWM in its efforts to secure the Waha Connector Agreements and the Waha Supply Agreement.

The discovery CFEi seeks from Denham is designed to obtain information about CFEi's and WWM's negotiations outside the formal tender process and any representations made to Denham about the future of CFEi and WWM's business relationship. For example, as noted, Turrent wrote to Denham executives that he would "take care" of the "waha stuff" for WWM even before any bidding process for the Waha contracts began. Similar communications, and other explanatory records, would go to the heart of the Mexican Criminal Proceeding as they would help determine whether Turrent and Gutiérrez violated Mexican procurement law in the award of natural gas contracts to WWM.

To that end, CFEi requests an order permitting it to serve a subpoena on Denham, requesting testimonial and documentary discovery relating to: (1) any information received by Denham from WWM, CFE or CFEi concerning actual or potential CFE or CFEi projects or

11

transactions including, but not limited to, the Waha Connector Agreements and the Waha Supply Agreement (Doc. Requests 6-9; Dep. Topics 3, 5); (2) information regarding Denham's investment in WWM, its involvement in WWM projects with CFE and/or CFEi, and its decision to sell its position in WWM (Doc. Requests 3-5; Dep. Topics 4-5); and (3) background information about the business of Denham (Doc. Request 1-2; Dep. Topics 1-2).

### A. Documents and Communications Concerning Actual or Potential CFE or CFEi Projects or Transactions

CFEi seeks documents from Denham that will show the extent to which Turrent and Gutiérrez agreed to award contracts to WWM prior to, and outside of, the required public tender process, or provided assurances to that effect. Such documents are relevant to establishing Turrent's and Gutiérrez's compliance, or the lack thereof, with Mexican procurement laws in awarding the Waha Connector Agreements to WWM. (*See* Aponte Decl. ¶¶ 30–34.)

Denham is likely to have information bearing on the improprieties in the awarding of the Waha Connector Agreements and Waha Supply Agreement because, as described above, Denham was involved in early discussions with WWM and CFEi regarding those projects.

Indeed, Denham's CEO, Stuart Porter, met with Turrent and WWM employees shortly before CFEi and WWM agreed to an MoU for multibillion-dollar natural gas contracts that were ultimately awarded to WWM after a suspect process orchestrated by Turrent and Gutiérrez. Those contracts include the Waha Supply Agreement and the Waha Connector Agreements. Representations made by CFE, CFEi or WWM to Denham prior to the award process to the effect that WWM would obtain the contracts would be strong evidence that Turrent and Gutiérrez violated the applicable procurement requirements under Mexican law. Moreover, communications in which CFEi or WWM discussed other actual or potential CFE or CFEi contracts with Denham would help determine the scope of the scheme alleged in the Mexican Criminal Proceeding.

### B.   Denham's WWM Investment and Divestment Decisions

Information relating to Denham's investment in WWM, its involvement in WWM projects, and its decision to sell its position in WWM would help the Mexican prosecutors and court understand the decision by Turrent and Gutiérrez to direct a steady stream of valuable contracts to WWM and their close associate Calhoun. For example, evidence relating to any assurances given to Denham by Turrent or Gutiérrez to secure Denham's investment in WWM would help determine the purpose and scope of Turrent's and Gutiérrez's misconduct regarding the award of the Waha contracts. Similarly, evidence tending to explain why Denham exited its investment in WWM shortly after Turrent and Gutiérrez left CFEi would help shed light on the relationship between WWM and Turrent and Gutiérrez.

### C.   Background Information About the Business of Denham

Finally, as necessary background for the topics above, CFEi also requests limited, general information about Denham's business.

### SECTION 1782 ENTITLES CFEI TO TAKE DISCOVERY FROM DENHAM

### I.   CFEi's Application Meets Section 1782's Threshold Requirements

Pursuant to 28 U.S.C. § 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."

In order to obtain discovery pursuant to Section 1782, a party must satisfy three threshold requirements: (1) the person or entity from whom discovery is sought must reside or be found in the district where the application is filed; (2) the discovery must be for use in a proceeding in a foreign or international tribunal; and (3) the application must be made by a foreign or international tribunal or "any interested person." 28 U.S.C. § 1782. This Application satisfies each of these requirements.

*First*, Denham resides in this District. According to the Massachusetts Secretary of Commonwealth corporate database, Denham Capital's headquarters and principal office is at 185 Dartmouth Street, Boston, MA 02116. (Anson Decl. ¶ 16.) An entity "resides or is found" for the purposes of Section 1782 in the district where it is headquartered or maintains its principal place of business. *See In re Valitus, Ltd.*, 2020 WL 6395591, at *5 (D. Mass. Nov. 2, 2020) (citing *Chevron Corp.* v. *Shefftz*, 754 F. Supp. 2d 254, 260 (D. Mass. 2010)).

*Second*, the discovery is sought for use in the ongoing Mexican Criminal Proceeding. Section 1782 expressly allows a court to authorize discovery for use in foreign proceedings, including "criminal investigations conducted before formal accusation." 28 U.S.C. § 1782. The First Circuit has indicated that discovery is deemed "for use" in a foreign proceeding when it is "sufficiently relevant" to that proceeding. *In re Schlich*, 893 F.3d 40, 52 (1st Cir. 2018) (noting that, although the First Circuit has "not had the opportunity to address the role of relevance in the § 1782 analysis," the Second Circuit has stated that "for use . . . incorporates a relevance requirement") (internal citation omitted). As discussed above, the discovery sought here is relevant in the Mexican Criminal Proceeding as it will help the Mexican prosecutors and the court in Mexico determine the scope of Turrent's and Gutiérrez's violation of Mexican procurement laws. CFEi has already provided Mexican prosecutors with information relating to their ongoing investigation and intends to continue to present evidence as an independent party in the criminal proceedings. (Aponte Decl. ¶¶ 34, 43.)

*Third*, CFEi is an interested party in the foreign proceeding, as it is both a victim of its former executives' alleged violations of the Mexican Constitution, criminal code, and procurement laws, and the party that filed the Criminal Complaint triggering the investigation. The term "interested party," as used in Section 1782, extends beyond litigants in the foreign

proceeding and includes a complainant whose complaint triggers an investigation, as well as the victim in the proceedings. *See Intel*, 542 U.S. 241 at 256–57; *In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d 361, 372 (S.D.N.Y. 2019) (complainant in a criminal investigation satisfies the "interested person" requirement of § 1782); *In re Application of O2CNI Co., Ltd.*, 2013 WL 5826730, at *11 (N.D. Cal. Oct. 29, 2013) ("An 'interested person' is one who possesses a reasonable interest in obtaining [judicial] assistance and includes a complainant who triggers an investigation by a state investigative body . . . .") (internal quotation marks omitted); *In re Caceres*, 2020 WL 2523120, at *2 (S.D. Miss. May 18, 2020) (complainant triggering foreign proceeding with the right to submit evidence qualified as an "interested person" under Section 1782).

Significantly, here, under Mexican law, as the owner of assets affected by Turrent's and Gutiérrez's suspected criminal acts, CFEi is an "injured party" as defined by the Mexican National Criminal Procedure Code ("CNPP"). (Aponte Decl. ¶ 21.)  As such, CFEi has significant participation rights in the criminal proceeding in Mexico. (*Id.* ¶¶ 21–23.)  Among these is the right to participate in the criminal proceedings as an independent party called a *coadyuvante*, capable of presenting evidence, arguments, and demands. (*Id.* ¶¶ 24–27.)  The CNPP allows victims to present any lawfully obtained evidence. (*Id.*)  After an indictment is filed by the prosecutors, the injured party may also request corrections to the indictment and offer additional evidence that it believes further supports the indictment. (*Id.* ¶ 26.)

Given CFEi's interest in the proceeding as the complaining victim, its prior provision of information for use by the Mexican authorities, and its ongoing ability to provide information, it clearly qualifies as an interested party under Section 1782.

II.     **The Discretionary Factors Courts Consider in Granting Section 1782 Applications Also Weigh in Favor of Granting CFEi's Application**

The Supreme Court has directed district courts to consider four factors in exercising their discretion to grant a Section 1782 application: (1) whether the entity from which discovery is being sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign court to U.S. federal-court assistance; (3) whether the Section 1782 request is merely "an attempt to circumvent foreign proof gathering restrictions" or policies of a foreign country; and (4) whether the subpoena contains unduly intrusive or burdensome requests. *Intel*, 542 U.S. at 264-65. The First Circuit has held that it does "not see the [*Intel*] factors as creating a 'burden' for either party to meet, but rather as considerations to guide the district court's decision." *Schlich*, 893 F.3d at 50. As detailed further below, each factor weighs heavily in favor of granting the requested discovery here.

A.     **Denham Is Not a Participant in the Mexican Criminal Proceeding**

Denham is not a participant or party to the Mexican Criminal Proceeding. (Aponte Decl. ¶ 28.) There is no established procedure in place for CFEi to obtain and introduce the evidence sought in this Application into the proceedings, absent granting of the Application.[7] (*Id.*) Rather, the documents and information sought by this Application are located in the United States and are outside of CFEi's reach through recourse to Mexican courts. *Id.*; *see Intel*, 542 U.S. at 264 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional

---

[7] It is not uncommon for a civil-law system, like Mexico's, to lack the pretrial discovery system that exists in the United States. *See Intel*, 542 U.S. at 261, n.12 ("The drafters of § 1782 were quite aware of the circumstance that civil law systems generally do not have American type pretrial discovery, and do not compel the production of documentary evidence.") (quoting Smit, *Recent Developments in International Litigation*, 35 S. Tex. L. Rev. 215, 235, n. 93 (1994)).

reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.").

**B.      The Mexican Authorities Are Receptive to U.S. Judicial Assistance**

The second *Intel* factor considers the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government to U.S. judicial assistance. *See Intel*, 542 U.S. at 264.  As an initial matter, the receptivity of the Mexican authorities to information provided by CFEi is already clearly established: the criminal investigation is premised on such information.  (Aponte Decl. ¶¶ 30–35.)

Moreover, on this record, and in the absence of "authority suggesting" that the Mexican prosecutors or court would reject evidence obtained under Section 1782, this factor weighs in favor of exercising discretion to grant a Section 1782 application.  *In re Penner*, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017); *see also In re Valitus, Ltd*., 2020 WL 6395591, at *7. Here, the "authority" suggests the opposite: Mexico's CNPP specifically allows for the victim of a crime to participate in the criminal proceedings as an independent party with the right to share evidence with prosecutors or present evidence, arguments, and demands of its own accord. (Aponte Decl. ¶¶ 21–27; *see In re Application of Qumma*, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2006) (finding no authoritative evidence that a Mexican court would reject additional evidence).)

Additionally, prior cases have recognized the receptivity of Mexican courts to evidence obtained through Section 1782.  *See id.*; *Grupo Mexico Sab De CV*, 2014 WL 12691097, at *3 (N.D. Tex. Oct. 17, 2014).  Therefore, it is clear that the second *Intel* factor weighs heavily in favor of granting the Application.

**C.     This Application Is a Good Faith Effort to Obtain Probative and Relevant Evidence for a Foreign Proceeding, and in No Way Circumvents Foreign Proof-Gathering Restrictions**

In determining whether an application constitutes an effort to circumvent foreign proof-gathering restrictions, the district court will assess whether the discovery is being sought in bad faith. *Chevron Corp.*, 754 F. Supp. 2d at 262. Of particular concern are applications that seek to end-run a previous unfavorable ruling by the foreign tribunal. *See In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006), *abrogated on other grounds by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019).

That is not the case here. As discussed above, CFEi has the ability to present the Mexican Special Anti-Corruption Prosecutor investigating the conduct at issue with relevant documents and information and to act as a "party" to the proceeding. (Aponte Decl. ¶¶ 21–27.) CFEi's request for discovery from Denham is a good faith effort to obtain probative evidence related to Denham's investments in WWM and transactions underlying the Mexican Criminal Proceeding. Moreover, no Mexican "proof-gathering restrictions" prevent CFEi from gathering the evidence sought in the United States to present in Mexico.

**D.     The Discovery Sought Is Not Unduly Intrusive or Burdensome**

The documents and testimony sought by CFEi are neither intrusive nor unduly burdensome. The requested discovery is narrowly focused on Denham's investments in WWM and knowledge of the improprieties in the procurement process for the Waha Connector Agreements. CFEi seeks to obtain information about the scope of the misconduct and procurement violations at issue in the Mexican Criminal Proceeding. Such discovery falls well within the scope of discovery permitted by the Federal Rules of Civil Procedure, which control once a Section 1782 application is granted. *See In re Valitus, Ltd.*, 2020 WL 6395591, at *8–9 (discovery requests not

unduly intrusive or burdensome where information sought went to central issues in foreign proceeding and would have been permitted under the Federal Rules of Civil Procedure).

**CONCLUSION**

For the foregoing reasons, CFEi respectfully requests that the Court enter an order, pursuant to 28 U.S.C. 1782, granting it leave to serve Denham with the subpoenas annexed to the Application as Exhibits 1 and 2.


Dated: Boston, Massachusetts
   July 15, 2022

         CHOATE HALL & STEWART LLP

         By: */s/ Diana K. Lloyd*
         Diana K. Lloyd, BBO No. 560586
         Jennie D. Wilusz, BBO No. 696156
         Two International Place
         Boston, MA 02110
         dlloyd@choate.com
         jwilusz@choate.com
         (617) 248-5000

           - and -

         PAUL, WEISS, RIFKIND,
          WHARTON & GARRISON LLP

         Michael E. Gertzman (*pro hac vice* pending)
         Harris Fischman (*pro hac vice* pending)
         Justin D. Lerer (*pro hac vice* pending)
         David K. Kessler (*pro hac vice* pending)
         1285 Avenue of the Americas
         New York, New York 10019-6064

         Mark F. Mendelson (*pro hac vice* pending)
         2001 K Street, N.W.
         Washington, DC 20006

         *Attorneys for Applicant CFE International LLC*

19

## LOCAL RULE 7.1(a)(2) CERTIFICATION

Counsel for CFE International LLC has not conferred with respondent pursuant to Rule 7.1(a)(2) regarding this application and memorandum, because the matter is being filed *ex parte* and under seal.

/s/ Diana K. Lloyd
Diana K. Lloyd, BBO No. 560586

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2022, I have served this original and memorandum upon the Clerk of Court; and I further certify that a true and correct copy will be served on attorneys of record upon unsealing of this matter or upon other order of this Court, in accordance with Local Rule 7.1(c).

/s/ Diana K. Lloyd
Diana K. Lloyd, BBO No. 560586

20